IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 12-cv-01726 RBJ

WHITEWAVE FOODS COMPANY,
a Delaware Corporation and
HORIZON ORGANIC DAIRY, LLC, a
Delaware Limited Liability Company,

        Plaintiff,

v.

LARRY HANSEN, an individual and
COOPERATIVE REGIONS OF ORGANIC
PRODUCER POOLS, d/b/a Organic Valley,
a Wisconsin Cooperative,

        Defendants.

---

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
AND BRIEF IN SUPPORT
(ORAL ARGUMENT REQUESTED)**

---

Larry Hansen left his employment with Defendants and immediately went to work doing the same job for their chief competitor. Pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, Plaintiffs move for entry of a Preliminary Injunction prohibiting (i) Larry Hansen ("Hansen") from disclosing or using any confidential information or trade secrets belonging to Plaintiffs, (ii) prohibiting Hansen from working for Cooperative Regions of Organic Producer Pools, d/b/a Organic Valley ("Organic Valley") in any position involving the same job or job duties as he had with Plaintiffs for a period of one year, and (iii) prohibiting Organic Valley from obtaining from Mr. Hansen or disclosing or using any confidential information or trade secrets belonging to Plaintiffs. This Motion is supported by the affidavit of Tom Spohn (attached as Ex.

A), and several other exhibits. Defendants are also moving contemporaneously for limited expedited discovery so that additional evidence can be presented at a hearing on this motion.

## D.C. COLO. L CIV R 7.1 CERTIFICATION

Counsel for Plaintiffs has conferred by telephone with out-of-state counsel for each Defendant in an attempt to determine whether an agreement regarding a preliminary injunction could be reached. To date, no agreement has been reached, and due to the nature of the relief requested, Plaintiffs could not further delay in filing this motion. Defendants do not agree to the relief requested.

## FACTUAL BACKGROUND

Plaintiff Horizon Organic Dairy, LLC ("Horizon") procures and sells organic milk across the United States. It is one of the leading organic milk retailers in the country. Horizon is owned by WhiteWave Foods Company ("WhiteWave").

In June 2008, Defendant Larry Hansen was hired by WhiteWave to serve in the position of Dairy Operations Manager – Milk Quality & Supply for Horizon. In that role, Hansen was responsible for milk procurement, milk quality, and farmer development in the west and southwest regions of the United States. His job responsibilities including forming personal relationships with Horizon's farmer-suppliers, negotiation of contractual relationships, forecasting milk production and demand, ensuring farmers understood and complied with various quality incentive programs, and procuring sufficient supply of organic milk to meet Horizon's sales needs. Hansen had these responsibilities for the entire period he was employed by Horizon. During his employment with Horizon, Hansen oversaw 48 farms, and was responsible for over 50% of the organic milk produced for Horizon, by volume.

When he began employment with Horizon, Hansen signed a "Nondisclosure and Proprietary Rights Agreement," a copy of which is attached as Exhibit A-1. In recognition of the "highly competitive field" in which Horizon operates, Hansen agreed to keep confidential all "information of commercial value that relates to" Horizon's business. (*See id.*) The types of information specifically listed include trade secrets, financial business information, marketing plans, business strategies, forecasts, customer lists, vendor lists, pricing structures, and projections. (*Id.*) The Agreement precludes Hansen from disclosing any of this information or using it for his own or a third party's benefit, and it also requires him to take "all reasonable precautions" to avoid any negligent or inadvertent disclosure of this information. (*Id.*)

Hansen also agreed, in writing, that he would full comply with all aspects of the WhiteWave Code of Ethics, which also imposes a duty to protect confidential information from disclosure. (*See* Ex. A-2.)

Hansen's employment with WhiteWave/Horizon gave him access to significant amounts of important confidential and trade secret information, including vendor lists, operating tolerances, sales demand projections, finely-tuned quality incentives, and strategic plans. (*See* Ex. A.) All of this information is highly valuable to Plaintiffs, and is the subject of consistent efforts to maintain its secrecy and confidentiality. (*See id.*)

On April 16, 2012, Hansen informed his supervisor that he would be resigning his position at Horizon, effective May 4, 2012. Despite repeated inquiries regarding where he would work after leaving Horizon, Hansen never told his supervisor what his future employment plans were, but appeared nervous and ill at ease during his exit interview. (*See id.*) Less than two weeks after Hansen's final day at Horizon, on May 14, 2012, he sent an email to a number of his

former producer contacts at Horizon. In the email, he informed them of his new email address and phone number. The email was sent from an address with the domain "organicvalley.coop."

Organic Valley is the major competitor of Horizon. (*See id.*) Together, these two companies provide the majority of the organic milk sold in the United States. No other brands or independent producers come anywhere close to the market share of these two companies, and there are no other nationally marketed organic milk brands.

Hansen appears to be working for Organic Valley in a position that is substantially similar to the position he occupied at Horizon. The person who managed Organic Valley's West coast supplier operations for organic milk recently retired. This appears to be the same or a very similar position as that which Hansen had at Horizon, with the same or similar territory. Hansen was hired by Organic Valley right about the time that this retirement information came out. Hansen has contacted at least one large Horizon milk supplier in his old region in his capacity as an employee of Organic Valley and has also been visiting producers in the growth area of New Mexico and Texas. (*See id.*)

Moreover, review of emails sent from Hansen's Horizon email address (most of which Hansen deleted) has revealed that Hansen had an in-person interview with Organic Valley on April 5, 2012, more than a week prior to informing his supervisor that he would be leaving Horizon. (*See* Ex. B (recovered emails).) Organic Valley reimbursed Hansen for the cost of a flight from his home in Oregon to the Organic Valley headquarters in Wisconsin, as well as for a rental car. Thus, Hansen's refusal to disclose his future employment plans to his supervisor at Horizon takes on an even more suspicious character.

Regardless of Hansen's formal title with Organic Valley, he has responsibilities and duties that largely overlap with his job duties at Horizon. This new job put him in a position to use Horizon's proprietary and trade secret information for his own and Organic Valley's benefit. Horizon therefore has a reasonable belief that Hansen is working for its chief competitor, in a role that would enable him to rely on the trade secrets he obtained while working at Horizon. Moreover, Hansen's unwillingness to discuss his plans after departure from Horizon and his subsequent hiring at Horizon's main competitor establish a substantial likelihood that the confidential and trade secret information Hansen had access to at Horizon is in danger of intentional or unintentional disclosure to Organic Valley. Attempts to communicate with Hansen and Organic Valley to discuss the nature of his employment and to ensure that Horizon's trade secrets will be protected have proved entirely unfruitful.

## ARGUMENT

### I.  LEGAL STANDARD FOR PRELIMINARY INJUNCTIONS

Horizon seeks injunctive relief (i) prohibiting Hansen from disclosing or using any confidential information or trade secrets belonging to Plaintiffs, (ii) prohibiting Hansen from working for Organic Valley in any position involving the same job or job duties as he had with Plaintiffs for a period of one year, and (iii) prohibiting Organic Valley from obtaining from Hansen or disclosing or using any confidential information or trade secrets belonging to Plaintiffs. An injunction is necessary to protect Plaintiffs from being subject to a competitive disadvantage as a result of Hansen's actions, and to protect their legitimate business interests, contracts, and goodwill.

The primary purpose of a preliminary injunction is to preserve the status quo, protect rights and prevent parties from sustaining irreparable injury pending the final determination of a case. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009).[1] The Court should issue an injunction where, as here, the right to relief is clear and unequivocal.

Under Fed. R. Civ. P. 65(a), a party is entitled to a preliminary injunction upon a showing that: (1) there is a likelihood of success on the merits; (2) there is a likelihood of irreparable injury which may be prevented by injunctive relief; (3) the balance of equities favors the injunction; and (4) granting a preliminary injunction would be in the public interest. *RoDa Drilling*, 552 F.3d at 1208 (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008)); *Big O Tires, LLC v. Felix Bros., Inc.*, 724 F. Supp. 2d 1107, 1115 (D. Colo. 2010).

## II. HORIZON IS ENTITLED TO A PRELIMINARY INJUNCTION

Plaintiffs meet every prong of the test for a preliminary injunction. They have shown a strong likelihood of success, they have a real danger of irreparable injury due to disclosure and/or use of trade secrets for the benefit of a competitor, the equities favor Plaintiffs because of the irreparable harm they have suffered/will suffer, and the requested relief will simply preserve the status quo by preventing Hansen from further breaching his contract and preventing Defendants from further misappropriating Horizon's trade secrets and confidential information.

---

[1] The status quo is defined as the "last uncontested status between the parties which preceded the controversy until the outcome of the final hearing." *See Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 269 F.3d 1149, 1154 (10th Cir. 2001). Here, the "status quo" would hold Hansen to his contractual obligations, and restrict Defendants from using the proprietary information that Defendants have misappropriated or threatened to misappropriate from Plaintiffs.

    **A.**    **Horizon Is Likely To Succeed On The Merits Of Its Claims for Misappropriation of Trade Secrets and Breach of Contract**

To demonstrate a likelihood of success on the merits, Horizon is only required to make a *prima facie* showing of a probable right to the ultimate relief and a probable danger of injury if the motion is denied. *Big O Tires, Inc. v. Bigfoot 4X4, Inc.*, 167 F. Supp. 2d 1216, 1221 (D. Colo. 2001); *Elec. Prod. Consol. v. Howell*, 117 P.2d 1010 (Colo. 1941). Further, Horizon must only raise a substantial question going to the merits "as to make them a fair ground for litigation and thus for more deliberative investigation." *Villaneuva v. Career*, 873 F. Supp. 434, 446 (D. Colo. 1994), *aff'd*, 85 F.3d 481 (10th Cir. 1996). Horizon is likely to succeed on the merits of its claims and therefore, easily satisfies this burden.

First, Hansen has violated the Colorado Uniform Trade Secret Act, which prohibits the actual or threatened misappropriation of trade secrets. "Temporary and final injunctions including affirmative acts may be granted on such equitable terms as the court deems reasonable to prevent or restrain actual or threatened misappropriation of a trade secret." C.R.S. § 7-74-103.[2] Under the Act, trade secrets include confidential business or financial information,

---

[2] Under C.R.S. § 7-74-102, "misappropriation" is defined as:

> (a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (b) Disclosure or use of a trade secret of another without express or implied consent by a person who: (I) Used improper means to acquire knowledge of the trade secret; or (II) At the time of disclosure or use, knew or had reason to know that such person's knowledge of the trade secret was: (A) Derived from or through a person who had utilized improper means to acquire it; (B) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (C) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (III) Before a material change of such person's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

customer or vendor lists, and any other secret and valuable information relating the owner's business. *See* C.R.S. § 7-74-102(4). To qualify for protection under the act, the information must actually be secret, and must be the subject of efforts to maintain the information's secrecy. *See id.*

A misappropriation occurs when, among other circumstances, a person discloses or uses another's trade secrets which he has obtained using improper means, including the breach or inducement of a breach of a duty to maintain their secrecy. C.R.S. § 7-74-102(2)(B)(I), (II)(B) (defining misappropriation); § 7-74-102(1) (defining improper means). The breach need not be willful or malicious to still qualify as a misappropriation. *See* C.R.S. § 7-74-104(2) (providing for exemplary damages for fraudulent, malicious, or willful and wanton misappropriation); *Mineral Deposits Ltd. v. Zigan*, 773 P.2d 606, 608 (Colo. App. 1988) (concluding that misappropriation occurs where trade secret is "divulged under an express or implied restriction of nondisclosure or nonuse").

The information Hansen learned while employed by Horizon meets the statutory definition of a trade secret. He had access to supplier lists, he had confidential information about the suppliers that was developed through his and others work at Horizon, and he knew confidential business and financial information about the company, including the details of Horizon's milk quality program, the milk procurement forecasts through 2014, and Horizon's strategic growth plans. He knew where Horizon wanted to increase or decrease supply, how it negotiated its contracts, what terms it wanted in the contracts, and what areas it was targeting for new supplies. He has now taken all of this knowledge to Horizon's main competitor. Working

for Organic Valley in the same or nearly the same role that he had at Horizon provides Hansen with a prime opportunity to use Horizon's confidential information to the benefit of Organic Valley and the detriment of Horizon. Horizon's trade secrets can easily be disclosed or used, even if this has not yet been done. Hansen's employment with Organic Valley is thus at least a threatened, if not actual, misappropriation of Horizon's trade secrets.

Hansen may well have already used and disclosed the trade secret information. However, Plaintiffs do not need to show that to prevail. In jurisdictions that follow the Uniform Trade Secrets Act, like Colorado, where trade secrets statutes permit injunctive relief based on a threatened misappropriation, courts have employed the doctrine of inevitable disclosure. The doctrine is a method in which to demonstrate a threatened misappropriation in cases where additional evidence of the threat of impending injury is unavailable to the applicant. *See Interbake Foods, L.L.C. v. Tomasiello*, 461 F. Supp. 2d 943, 973 (N.D. Iowa 2006).[3]

The doctrine of inevitable disclosure is necessary to prevent the misappropriation of trade secrets by employees who have knowledge of such sensitive and useful trade secrets that they cannot help but disclose them if they are hired by a competitor. In such a situation, the former employer "finds itself in the position of a coach, one of whose players has left, playbook in hand, to join the opposing team before the big game." *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1270 (7th Cir. 1995). The danger lies not only in the possibility that the employee could willfully or

---

[3] Colorado law provides for an injunction for threatened misappropriation, *see* C.R.S. § 7-74-103, but Colorado courts have neither adopted nor rejected the inevitable disclosure doctrine. *See Xantrex Tech. Inc. v. Advanced Energy Indus., Inc.*, Case No. 07-cv-02324-WYD-MEH, 2008 WL 2185882, at *19 (D. Colo. May 23, 2008) (unpublished). Other cases applying the inevitable disclosure doctrine within the context of the UTSA are thus instructive here. *See* C.R.S. § 7-74-109 (requiring courts to apply and construe Colorado's UTSA to "effectuate its general purpose" to consistently apply the Uniform Trade Secrets Act).

intentionally disclose the employer's trade secrets, but also that the employee could—perhaps even unwittingly—rely on his or her knowledge of the employer's business plans to strategically anticipate and respond to these plans, and thus unfairly benefit the new employer. It is a rare individual indeed who could be unaffected by that kind of knowledge. *See, e.g.*, *FMC Corp. v. Varco Intern., Inc.*, 677 F.2d 500, 504 (5th Cir. 1982) ("Even assuming the best of good faith, [the employee] will have difficulty preventing his knowledge of [the plaintiff's trade secrets] from infiltrating his work."); *Barilla Am., Inc. v. Wright*, No. 4-02-CV-90267, 2002 WL 31165069, at *9 (S.D. Iowa July 5, 2002) (explaining that the inevitable disclosure doctrine seeks to prevent disclosures that would be made despite an employee's best intentions).

Courts use a variety of factors in determining whether a claim of inevitable disclosure is sufficiently supported by the facts. *See, e.g.*, *Merck & Co., Inc. v. Lyon*, 941 F. Supp. 1443, 1460 (M.D.N.C. 1996) ("A likelihood of disclosure could be shown by the degree of similarity between the employee's former and current position, and the value of the information."). The doctrine is frequently applied to prevent disclosure of trade secrets by employees, like Hansen, who leave one employer to take a nearly identical position with the employer's primary competitor, especially when that employee had access to sensitive strategy and forecast information. For example, in *International Business Machines Corporation v. Papermaster*, No. 08-CV-9078 (KMK), 2008 WL 4974508 (S.D.N.Y. Nov. 21. 2008), IBM's former Vice-President of Microprocessor Technology Development left IBM to accept a position developing similar technology for Apple's iPod/iPhone division. *Id.* at *5. In his position with IBM, the employee had access not only to highly proprietary technical data regarding microprocessors, but to recruiting data, organizational capabilities, and corporate strategies. *Id.* at *3. Apple sought

to recruit the employee to manage its iPod/iPhone division, with specific emphasis in managing the potential replacement of microprocessor chips formerly manufactured by IBM with chips manufactured by a recently-acquired Apple subsidiary. *Id.* at *5. The court applied the inevitable disclosure doctrine, relying on four factors, including (1) the extent to which the new employer is a direct competitor of the former employer; (2) whether the employee's new position is nearly identical to his old one; (3) the extent to which the trade secrets at issue are of value to the new employer; and (4) the nature of the industry and its trade secrets. *Id.* at *7 (citing, among others, *EarthWeb, Inc. v. Schlack*, F. Supp. 2d 299, 310 (S.D.N.Y. 1999)). The court granted injunctive relief, concluding that it was inevitable that the employee would draw upon his experience and expertise in microprocessors to ensure that the iPod and iPhone were fitted with the best technology at the lowest cost. *Id.* at *9. As a result, the employee would harm IBM in "unquantifiable ways." *Id.*

Here, the facts regarding Hansen's employment with Organic Valley indicate that disclosure of Horizon's trade secrets is inevitable. Horizon and Organic Valley are direct competitors—in fact, they are the two largest sellers of organic milk nationwide. According to the information Horizon has obtained to date, Hansen's new position at Organic Valley involves significant overlap of duties with the position he formerly held at Horizon. He is working in the same region, with the same pool of suppliers, and doing the same sort of things he did at Horizon. Knowledge of Horizon's milk demand forecasts and growth strategies as well as its supplier lists and relationships could obviously lend a competitive advantage to Organic Valley; and Hansen's extensive knowledge of Horizon's industry-leading milk quality program would undoubtedly be of great value to Organic Valley as well. Finally, the organic milk industry is

highly competitive, and the participants in this market keep their business strategies closely guarded. For these reasons, like in *Papermaster*, disclosure of Horizon's trade secrets is inevitable.

Unless an employee possesses an "uncanny ability to compartmentalize information," he or she will necessarily use the previous employer's trade secrets when making decisions on behalf the subsequent employer. *PepsiCo*, 54 F.3d at 1269. There is no indication that Hansen possesses this uncanny ability. Rather, Horizon has established more than simply the existence of its trade secrets and that Hansen is employed by Organic Valley. *See Xantrex*, 2008 WL 2185882, at *19. Instead, because Hansen's new duties significantly overlap with his previous duties in highly strategic positions, and because the trade secret information Hansen possesses will be of great value to Organic Valley in light of the highly dynamic and competitive nature of the organic milk industry, it is impossible to conceive that Hansen will simply forget or compartmentalize that information. The disclosure of Horizon's trade secrets, in this situation, is evitable. Accordingly, Defendants have shown a reasonable probability of success on their trade secret claim.

Additionally, Defendants are also likely to prevail on their breach of contract claim. To state a claim for breach of contract, Horizon must prove: (i) the existence of a contract; (ii) that Horizon substantially performed under it; (iii) Hansen failed to perform under the contract; and (iv) resulting damage. *Western Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992).

Hansen signed a Nondisclosure Agreement when he began his employment with Plaintiffs. That Agreement required him to keep Plaintiffs' information confidential and to not use it for the benefit of himself or a third party. Plaintiffs have substantially performed all of

their requirements under the agreement. As demonstrated above in the discussion regarding trade secrets, Hansen's actions—particularly given his evasive responses when questioned regarding his future employment, and his all but immediate defection to Horizon's largest competitor to take on a nearly identical role—do not comply with his contractual duty to take "all necessary steps" to protect Horizon's trade secrets and other confidential business information and to not use that information for his or a third party's benefit. As a result, Horizon has suffered damage because its confidential and proprietary information, and trade secrets, are now available for the use of its chief competitor. Accordingly, Horizon will succeed on its claim for breach of contract.

### B. Plaintiff Will Suffer Irreparable Injury If a Preliminary Injunction is Not Issued

To warrant injunctive relief, Horizon must demonstrate that it will suffer irreparable harm absent its issuance. *RoDa Drilling*, 552 F.3d at 1208. Irreparable harm is a "pliant term adaptable to the unique circumstances that an individual case might present." *Gitlitz v. Bellock*, 171 P.3d 1274, 1278-79 (Colo. App. 2007). Irreparable harm exists when there is a significant risk that the movant will experience a harm that cannot adequately be compensated after the fact by monetary damages. *Id.* at 1279. The Tenth Circuit has held, in similar situations, that "when the evidence shows that the defendants are engaged in, or about to be engaged in, the act or practices prohibited by a statute which provides for injunctive relief to prevent such violations, irreparable harm to the plaintiffs need not be shown." *Star Fuel Marts, LLC v. Sam's E., Inc.*, 362 F.3d 639, 651 (10th Cir. 2004) (internal punctuation omitted); *see also Xantrex Tech. Inc. v. Advanced Energy Indus., Inc.*, CIV-A 07-CV-02324-WYD-MEH, 2008 WL 2185882, at *14 (D. Colo. May 23, 2008) (applying this principle to claims under the Colorado Uniform Trade

Secrets Act). Because the evidence shows that Hansen and Organic Valley are either already violating or inevitably will violate the Colorado Uniform Trade Secrets Act, no irreparable harm need be shown.

Nevertheless, even if a showing of irreparable harm is required here, Plaintiff satisfies this burden. Because unlawful competition inherently results in damage to Plaintiffs' goodwill and diminishment of their competitive position in the marketplace, courts have consistently recognized the difficulty in fairly valuing the economic harm that can result from unlawful competition like Horizon has suffered in in this case. Once a trade secret is disclosed, the holder's competitive position in the market is lost, monetary damages are insufficient, and the harm is irreparable. *See Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1264 (10th Cir. 2004); *see also JAK Prods., Inc. v. Wiza*, 986 1080, 1084 (7th Cir. 1993) (concluding under Indiana UTSA that when employee uses experience gained from employer in violation of covenant not-to-compete, irreparable injury occurs). In situations involving unfair competition, injunctive relief is the "most common and generally preferred relief," because it terminates the unlawful conduct and prevents damages from accruing in the future. *DBA Enterprises, Inc. v. Findlay*, 923 P.2d 298, 302 (Colo. App. 1996).

Hansen's conduct is causing, and will continue to cause, irreparable harm to Horizon for which there is no adequate legal remedy. Indeed, in the Nondisclosure Agreement, Hansen expressly acknowledged and agreed that a breach would cause irreparable injury and would be grounds for an injunction. (*See* Ex. A-1.) Hansen had access to a large amount of highly sensitive proprietary information, the use of which by Horizon's primary competitor could result in far-reaching, yet difficult to quantify, competitive injury. This is the very reason that Horizon

required Hansen, as a condition of his employment, to take all reasonable precautions to protect this information from intentional and inadvertent disclosure.

This Court has enforced an injunction under a similar factual situation. In *Xantrex Technologies*, an employee responsible for a company's solar inverter product development left to perform the same function at a competitor. He misled his former employer about his future employment plans. The purpose of his new job was to help the new employer enter into direct competition with his former employer, in the hopes that his previous employer would lose market share and customer business. The Court found this was sufficient to show irreparable injury, and enjoined the defendant from working for the new employer in the same role he had filled at his former employer. *See* 2008 WL 2185882, at *15.

Because Horizon is threatened with an immediate irreparable injury in the absence of injunctive relief, there is no other speedy or adequate remedy at law.

### C. The Enforcement of Valid Contracts, and the Prevention of Unfair Competition, is in the Public Interest

Horizon is only required to show that the injunction it seeks would not be adverse to the public interest. *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir. 1991). The public clearly has a strong interest in (1) the full and fair adjudication of rights and the enforcement of parties' contracts, (2) prohibiting and eliminating unlawful and harmful business practices involving a competitor's proprietary information, and (3) preventing a competitor's wrongful interference with another company's contracts or prospective business. *See e.g., Am. Television & Commc'n Corp. v. Manning*, 651 P.2d 440, 445 (Colo. App. 1982) (the public does not have an interest in protecting a business that derives a benefit from engaging in unlawful and unauthorized activity). Injunctive relief here just enforces a confidentiality agreement, protects

Horizon's confidential information and trade secrets, and otherwise prevents Defendants from engaging in unlawful conduct. This is clearly in the public interest.

### D. Any Conceivable Harm to Defendants is Far Outweighed by the Competitive Injury to Horizon Caused by Their Misconduct

Under the controlling test, the Court must also balance the hardships to Plaintiffs and Defendants if injunctive relief is issued. Here, that balance tips overwhelmingly in Plaintiffs' favor. Preliminary injunctive relief will simply preserve the status quo before Hansen took the position that resulted in actual or threatened misappropriation of trade secrets and breach of contract. An injunction will ensure that Horizon can obtain the relief it seeks on the merits when it prevails. Holding Hansen to his non-disclosure agreement, and requiring him not to take a nearly identical position with his former employer's chief competitor, merely enforces his agreement with Horizon on a short-term basis. While Hansen may be temporarily harmed by an inability to take a particular job with a particular employer, he will not be prevented from <u>all</u> employment, nor even from all employment with Organic Valley.

On the other hand, if an injunction is not issued, Horizon's position in the marketplace and its business competitiveness will be irreparably harmed. Plaintiffs' potential harm far outweighs any perceived, temporary harm to Defendants.

### CONCLUSION

Unless Hansen is enjoined from employment with Organic Valley that is substantially the same as his role at Horizon, Horizon will suffer immediate and irreparable injury through the disclosure of its trade secrets, whether through inadvertent or intentional means. Therefore, pursuant to Rule 65(a), this Court should order a Preliminary Injunction.

Plaintiffs respectfully request a hearing on this motion for preliminary injunction, at which the parties may present oral argument and evidence in support of their positions.

Dated: July 11, 2012     Respectfully submitted,

/s/ Kelly A. Laudenslager
Craig R. May (#32267)
Kelly A. Laudenslager (#41553)
Wheeler Trigg O'Donnell LLP
370 Seventeenth Street, Suite 4500
Denver, CO  80202-5647
Telephone: 303.244.1800
Facsimile:   303.244.1879
E-mail:  may@wtotrial.com
E-mail:  laudenslager@wtotrial.com

Attorneys for Plaintiff
WhiteWave Foods Company

## **CERTIFICATE OF SERVICE (CM/ECF)**

I hereby certify that on July 11, 2012, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following email addresses:

- **Cathy Havener Greer**
  cgreer@warllc.com,bmccall@warllc.com,ssykes@warllc.com,hjohnson@warllc.com

- **Kelly Anne Laudenslager**
  laudenslager@wtotrial.com,lorubbio@wtotrial.com

- **Craig Ruvel May**
  may@wtotrial.com,ramirez@wtotrial.com,prechodko@wtotrial.com

- **William Thomas O'Connell , III**
  woconnell@warllc.com,bmccall@warllc.com,ssykes@warllc.com,hjohnson@warllc.com

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participants:

David W. Jacobson, Esq.
Mills Jacobson Halliday, PC
715 Commercial Street N.E.
Salem, OR 97301
Facsimile:  503-588-0948
E-mail:  dj@mjhlapc.com

*Attorney for Defendant Larry Hansen*

Kathy L. Nusslock
Davis & Kuelthau, S.C.,
111 E. Kilboum Ave., Suite 1400
Milwaukee,WI 53202
E-mail:  knusslock@dkattorneys.com

*Attorney for Cooperative Regions of Organic Producer Pools*

/s/ Kelly A. Laudenslager